UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**EMMANUEL YOUNG**,                     Case No. 1:10 CV 2900

      Plaintiff,                     Magistrate Judge James R. Knepp II

    v.                                   MEMORANDUM  OPINION  AND
                                         ORDER

**COMMISSIONER OF SOCIAL SECURITY**,

      Defendant.

### INTRODUCTION

Plaintiff Emmanuel Young seeks judicial review of Defendant Commissioner of Social Security's decision that his disability ceased on May 1, 2005. The district court has jurisdiction over this case under 42 U.S.C. § 1383(c)(3). The parties consented to the exercise of jurisdiction by the undersigned in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 31). For the reasons given below, the Court affirms the Commissioner's decision determining Plaintiff's disability ceased May 1, 2005.

### BACKGROUND

In October 1997, Plaintiff's mother filed an application for Supplemental Security Income (SSI) on Plaintiff's behalf, alleging an onset date of July 24, 1995. (Tr. 70–72). Plaintiff was found disabled as of September 1, 1997 and awarded benefits. (Tr. 73). In January 2002, the Social Security Administration found Plaintiff continued to be disabled. (Tr. 199–204). Specifically, the agency found Plaintiff's borderline intellectual functioning and speech disorder functionally equaled listing 2.09, due to extreme limitations interacting and relating with others. (Tr. 199–204). In May 2005, the Social Security Administration issued a decision stating Plaintiff's disability had ceased

due to medical improvement on May 1, 2005. (Tr. 74–75). On reconsideration, the agency affirmed

its decision. (Tr. 102–03). Plaintiff requested a hearing before an Administrative Law Judge (ALJ)

(Tr. 106–07) and was 13 when the ALJ hearing was held on February 12, 2009. (Tr. 48, 70). The

ALJ found Plaintiff's disability ended May 1, 2005 and further found he had not become disabled

again since that date. (Tr. 33).

Medical and Educational History

Plaintiff was born July 24, 1995. (Tr. 73). He has never engaged in substantial gainful

activity, and he resides with his mother. (Tr. 143, 153). At the time of the ALJ hearing, Plaintiff was

in seventh grade. (Tr. 52). Plaintiff has a history of speech and language delays, borderline

intelligence, and psychological issues. In August 1997, medical records from Dr. Adebowale

Adedipe at Saint Luke's Pediatric Care show Plaintiff was referred to a speech specialist. (Tr. 155).

Records from 1998 through 2000 continue to mention Plaintiff's speech delays. (Tr. 155, 157–58,

161–62, 165–66). Plaintiff had poor pronunciation and needed to attend speech therapy once to

twice a week. (Tr. 162, 165).

In May 2001, the Cleveland Municipal School District evaluated Plaintiff. (Tr. 303–12). At

that time, Plaintiff was five and enrolled in the Preschool Children with Disabilities program. (Tr.

306). Plaintiff continued to fall below age expectations in the areas of speech and language, and the

school psychologist believed Plaintiff "may have a difficult time in a regular education classroom

without supportive services". (Tr. 306). Plaintiff scored in the twenty-seventh percentile for his early

reading ability, and in the ninth percentile for his early mathematic ability. (Tr. 306). Plaintiff's

speech was very difficult to understand and he had a difficult time responding to questions. (Tr.

307). Articulation difficulties also caused Plaintiff to hold back and not participate in class activities.

2

(Tr. 307). On the General Conceptual Ability test, Plaintiff scored within the low range, indicating he performed as well or better than only eight percent of same-age individuals. (Tr. 307). His verbal and non-verbal sub-test scores were below average, and his sub-test scores were in the low range for the early number concepts sub-test. (Tr. 308).

A speech-language pathologist, Carol L. Spears, also evaluated Plaintiff. (Tr. 309). She found Plaintiff's receptive language, expressive language, and articulation skills were all below average. (Tr. 310). She found he could answer simple questions, but had difficulty with more complex ones. (Tr. 310). Additionally, she found Plaintiff did not use possessive word endings, plural forms, or past tense forms. (Tr. 310). Spears also noted multiple consonant sound substitutions and omissions. (Tr. 310). Ultimately, "[t]hese errors in sound production often render[ed Plaintiff's] speech unintelligible." (Tr. 310). He showed limitations in his abilities to understand age-appropriate vocabulary and concepts and to effectively communicate age-appropriate messages. (Tr. 310). Spears believed these deficits in receptive and expressive language could affect his ability to acquire information. (Tr. 310). Additionally, errors in sound production would affect a teacher's ability to understand Plaintiff. (Tr 310). Ultimately, the evaluation team determined Plaintiff should be placed in a regular kindergarten program with speech and language services. (Tr. 311).

In October 2001, a teacher reported Plaintiff attended classes in a regular classroom and also received help with his speech and language impairment. (Tr. 172). She stated Plaintiff's functioning was "[n]ot a problem" compared to children the same age who did not have impairments and further stated his cognitive functioning was age-appropriate compared to other children his age. (Tr. 173). The teacher reported she could understand almost all Plaintiff's speech when she knew the topic of conversation and half to two-thirds of his speech when she did not know the topic of conversation.

(Tr. 174). The teacher rated Plaintiff very low on his oral language skills, but stated his speech and language did not adversely affect his educational performance or socialization with peers. (Tr. 174). She did state Plaintiff was receiving speech therapy and further opined Plaintiff's personal functioning, social functioning, and concentration, persistence, or pace were age-appropriate. (Tr. 174–76).

In October 2001, pediatric pulmonary fellow Dr. Meeghan Hart wrote to Plaintiff's treating physician Dr. Adedipe inquiring about Plaintiff's medical history. (Tr. 259–61). When Dr. Hart examined Plaintiff regarding complaints of shortness of breath with exercise, she noted his history of food aversion and shortness of breath with exercise, but stated she needed further medical history to fully assess Plaintiff. (Tr. 260). Dr. Hart wrote to Dr. Adedipe again in February 2002, stating Plaintiff had done well, without problems with chronic cough or wheeze, since his last visit. (Tr. 263). Plaintiff was not taking any medications and did not exhibit any exercise symptoms or problems. (Tr. 263). Dr. Hart opined Plaintiff "d[id] not seem to have symptoms consistent with asthma", although he should continue to follow up with doctors as needed. (Tr. 263).

On November 26, 2001, psychologist Dr. Donald S. Leventhal evaluated Plaintiff. (Tr. 191). Dr. Leventhal described Plaintiff's communication difficulties and noted Plaintiff's initial fearfulness during the evaluation, but he found no abnormality of mental content and no abnormality with regard to body concerns. (Tr. 192–93). He described Plaintiff's fund of knowledge as "near age appropriate." (Tr. 194). Plaintiff's IQ was 74, placing him in the borderline range. (Tr. 194). He scored in the twenty-seventh, thirty-seventh, and sixteenth percentiles in reading, spelling, and arithmetic respectively. (Tr. 195). Overall, Dr. Leventhal opined Plaintiff operated at "somewhat less than three-quarters of the age appropriate level of functioning" for his cognition. (Tr. 197). He

4

was at only two-thirds of the age appropriate level for communication and gross and fine motor coordination. (Tr. 197). In the socialization and concentration, persistence, and pace areas, Plaintiff operated at three-quarters of the age appropriate level, and Dr. Leventhal noted no impairment in personal or behavioral patterns. (Tr. 197). He diagnosed Plaintiff with phonological disorder, communication disorder, and borderline intellectual functioning, indicating Plaintiff also experienced psychosocial stress due to not always being clearly understood by others. (Tr. 198). Dr. Leventhal assigned Plaintiff a global assessment of functioning (GAF) level of 60. (Tr. 198).

Plaintiff was evaluated at the Cleveland Hearing and Speech Center on November 27, 2001. (Tr. 185). Plaintiff ranked in only the first percentile on his speech sound production test, the third percentile on his oral expression test, and the sixteenth percentile for listening comprehension. (Tr. 187). The results indicated Plaintiff had a moderate-to-severe articulation and expressive language deficit, but his prognosis was good. (Tr. 185). Plaintiff was to attend speech and language therapy once a week for at least six to nine months. (Tr. 185). At this time, Plaintiff's mother reported she could understand him only 50 percent of the time, further reporting unfamiliar listeners had trouble understanding him most of the time. (Tr. 186).

In January 2002, it was determined Plaintiff still functionally equaled listing 2.09. (Tr. 199–200). He was determined to have extreme difficulty interacting and relating with others. (Tr. 201). Test results from 2002 indicate Plaintiff was below average in a number of listening and comprehension skills (Tr. 300), but records from July 2003 begin to show improvement: Dr. Adedipe checked boxes indicating Plaintiff's language, speech, reading, school performance, family, and peer relationships were all within normal limits. (Tr. 266). In September 2003, Plaintiff's speech-language pathologist stated Plaintiff's speech and language skills needed additional therapy,

and she planned to continue therapy once a week for at least six months. (Tr. 212). In May 2004, when Plaintiff was in second grade, Dr. Adedipe again noted Plaintiff's speech, language, reading, school performance, family, and peer relationships were all within normal limits. (Tr. 271). By September 2004, Plaintiff's speech-language pathologist noted Plaintiff had attained one of his therapy goals and made progress in all but one of his goals. (Tr. 214). She stated Plaintiff was showing more independent thinking and was more independently and accurately writing complete sentences, but still needed work with past-tense verbs. (Tr. 214). Plaintiff demonstrated acquisition of skills to enhance his communication and was applying those skills outside the therapy setting. (Tr. 217).

In October 2004 at Plaintiff's mother's request, Plaintiff's teacher referred him to Beech Brook counselor and licensed social worker (LSW) Amy Merriman. (Tr. 220–21). Plaintiff's teacher reported Plaintiff had difficulty accepting corrections and getting along with his peers. (Tr. 221). She also reported Plaintiff had difficulty controlling noise and talking out, keeping his hands and feet to himself, following directions, and staying in assigned areas. (Tr. 233). Plaintiff's mother reported Plaintiff was very sensitive and became angry or got his feelings hurt easily when someone corrected him, or when his peers refused to be friends with him. (Tr. 221). Plaintiff also expressed feeling angry when making mistakes and reported peer problems. (Tr. 221). According to Plaintiff's mother, Plaintiff enjoys playing video games, and he also participates in church activities and at that time was taking boxing lessons. (Tr. 223). Plaintiff's mother also reported Plaintiff did not get into much trouble. (Tr. 226).

Plaintiff's mother worried Plaintiff could have a learning disability, as teachers told her he rarely completed his homework and never completed in-class assignments. (Tr. 226). Merriman

6

indicated Plaintiff had impaired articulation in his speech and a sad, dysthymic affect. (Tr. 231–32). Overall, Merriman reported Plaintiff was cooperative during the intake interview. (Tr. 232). She stated Plaintiff was very thin and believed himself to be unhealthy because of his low weight. (Tr. 232). Merriman "found that [Plaintiff] appears to have an obsession with body weight and body image", and mentioned Plaintiff's mother's reports that until he was seven, Plaintiff could not consume anything other than milk without vomiting. (Tr. 233). Merriman diagnosed Plaintiff with disruptive behavior disorder, feeding disorder of early childhood, overanxious disorder of childhood, and dysthymic disorder, also noting his educational problems, discord with teachers and classmates, and history of eating disorder. (Tr. 234).

School records from November 2004 note Plaintiff did well when given assistance, but needed extended time to complete assignments. (Tr. 301). The school noted Plaintiff was easily distracted, his comprehension level was described as weak, and he often did not understand oral and written instructions. (Tr. 301). The teacher indicated Plaintiff needed to learn to stay focused, ask questions, and repeat directions to the teacher to measure his understanding of expectations on assignments. (Tr. 301). Additionally, the teacher reported Plaintiff tended to follow other students' examples, losing focus when others misbehave. (Tr. 301).

LSW Merriman continued to meet with Plaintiff on a weekly basis from October 2004 until January 2005. (Tr. 257). In January 2005, Merriman reviewed Plaintiff's progress. (Tr. 249). Plaintiff's behavior at home had improved, and he was arguing and fighting less frequently. (Tr. 251). While he had appeared sad and withdrawn at the beginning of the school year, in January he reported feeling much happier and having several friends in his class. (Tr. 251). Further, Plaintiff never exhibited disruptive behaviors at his current school, and the frequency and intensity of his

7

depression "ha[d] definitely decreased." (Tr. 251).

Despite these areas of progress, Plaintiff had made limited progress with his anxiety and body-weight preoccupation. (Tr. 251). Merriman planned to address these issues with Plaintiff during the next quarter of treatment. (Tr. 251). In a letter written January 20, 2005, Merriman wrote that while Plaintiff required extra time to complete tests and assignments due to a learning disability, "he always produce[d] quality work." (Tr. 257). She believed Plaintiff's diligence and willingness to work would aid his treatment progress. (Tr. 257). In Merriman's opinion, Plaintiff needed to continue receiving counseling services to help him learn positive social skills and manage his anxiety and depression. (Tr. 257).

Plaintiff's mother completed a function report on January 26, 2005. (Tr. 117). She reported people who do not know Plaintiff well can understand his speech "[s]ome of the time", explaining Plaintiff sometimes has problems getting words out clearly. (Tr. 119). She also stated Plaintiff has difficulties communicating with family and friends. (Tr. 120). Additionally, Plaintiff's mother reported Plaintiff's ability to progress in learning is limited, indicating he has comprehension problems and difficulty writing. (Tr. 121). She reported Plaintiff had friends his own age, but could not make new friends, and she stated he generally gets along with adults, including his teachers. (Tr. 123). Plaintiff generally completes his chores and homework, but sometimes gets off track and has difficulty completing tasks without being reminded. (Tr. 125). On another form, Plaintiff's mother stated Plaintiff does some chores, and likes watching and playing sports, playing video games, and watching television. (Tr. 130). She also reported Plaintiff visits friends and relatives. (Tr. 130).

In February 2005, Plaintiff's sister completed a disability report for Plaintiff. (Tr. 205–08). Describing Plaintiff's daily activities, she stated he gets up and gets ready for school. (Tr. 205).

8

Once home after school, he does his homework, eats, and watches a little television. (Tr. 205). Twice a week, he attends church. (Tr. 205). She reported he was attending an after-school program for reading and went to speech therapy once a week. (Tr. 205). Though she reported Plaintiff helps with some household chores, she indicated he sometimes has to redo the work. (Tr. 205). She said Plaintiff becomes distracted easily and requires day-long supervision, but gets along adequately with friends and playmates. (Tr. 205). Plaintiff's sister stated Plaintiff has poor peer relations, anxiety, and depression. (Tr. 206). She also reported Plaintiff does not listen well and needs instructions to be repeated to complete tasks. (Tr. 206). She stated even family could not understand Plaintiff's speech some of the time, and indicated trouble with strangers understanding him. (Tr. 207).

In February 2005, Plaintiff's speech therapist completed a report about Plaintiff's functioning. (Tr. 210–11). She stated Plaintiff's intelligibility in known-context conversation had increased to 100 percent, and in unknown-context conversation his intelligibility had increased to 90 percent. (Tr. 210). The therapist stated Plaintiff's prognosis for language, speech, and writing abilities was good with continued therapy, but she did state Plaintiff's difficulties were negatively impacting his ability to perform to grade level at school. (Tr. 210–11).

In March 2005, Dr. J. Joseph Konieczny completed a psychological evaluation of Plaintiff for the Bureau of Disability Determination. (Tr. 275–79). Plaintiff and his mother both participated in and cooperated with the evaluation process. (Tr. 275). Dr. Konieczny noted Plaintiff had never been diagnosed with Attention-Deficit/Hyperactivity Disorder (ADHD) and was not taking any prescribed medications. (Tr. 276). He also stated Plaintiff was a third-grade student performing adequately in his program, with no disciplinary difficulties. (Tr. 276). Plaintiff had been in regular education classes since kindergarten, and had not repeated any grades. (Tr. 276). Dr. Konieczny did

note Plaintiff's therapy with Merriman. (Tr. 276). According to Dr. Konieczny's report, Plaintiff was compliant in home and school settings. (Tr. 276). Plaintiff presented as neatly attired, with adequate hygiene and grooming, and appeared to be of average height and weight for his age. (Tr. 276). Despite fatigue, Plaintiff "related very pleasantly and easily to the examiner", was cooperative, responded readily to all questions and tasks. (Tr. 276). Additionally, Plaintiff showed no indications of mood swings, mood disturbance, or diminished tolerance for frustration. (Tr. 276). Plaintiff did not display speech or articulation difficulties, and Dr. Konieczny opined Plaintiff's speech level appeared adequate for an individual his age. (Tr. 276).

Plaintiff demonstrated a full-scale IQ of 77, placing him in the borderline range of intellectual functioning. (Tr. 277). Plaintiff showed his most marked deficits in the areas of attention and concentration, auditory imagery, and retentiveness. (Tr. 277). He showed relative strengths in the areas of visual memory and discrimination, and visual-motor coordination. (Tr. 277). His abilities in the areas of verbal comprehension and working memory fell in the borderline range, while his abilities in the areas of processing speed and perceptual reasoning fell in the average and low-average ranges respectively. (Tr 277). Dr. Konieczny found Plaintiff's capabilities in the area of arithmetic were in the average range, while his spelling-achievement and reading-achievement capabilities fell in the low-average range. (Tr. 277). Test results indicated Plaintiff's adaptive capabilities in the area of socialization were in the average range – significantly higher than would be expected given his overall intellectual functioning level. (Tr. 278). In the area of daily living skills, his adaptive capabilities fell in the low-average range. (Tr. 278). Plaintiff's adaptive capabilities in the area of communications fell in the low-average to borderline range, and his capabilities in the specific areas of expressive and written communications were found to be

10

moderately low. (Tr. 278). All other adaptive capabilities were regarded as adequate. (Tr. 278).

Overall, Dr. Konieczny opined Plaintiff's intellectual capabilities lie in the borderline range, and he believed Plaintiff suffers from Borderline Intellectual Functioning. (Tr. 277–78). In the area of cognition, Dr. Konieczny stated Plaintiff's capabilities were at a two-third level of age-appropriate functioning. (Tr. 279). His capabilities in the area of communication were at a two-third to three-quarter level of age-appropriate functioning. (Tr. 279). His motor skills and capabilities in the areas of social skills, emotional skills, and concentration and persistence were found to be adequate for an individual his age. (Tr. 279). Plaintiff's capabilities in the areas of personal and behavioral patterns were at a three-quarter to full level of age-appropriate functioning. (Tr. 279). According to Dr. Konieczny, Plaintiff's level of speech appeared adequate for an individual his age. (Tr. 279). He assigned Plaintiff a GAF of 64 for symptom severity and 56 for functional severity, reflecting mild-to-moderate intellectual limitations. (Tr. 279).

In May 2005, the Bureau of Disability Determination determined Plaintiff was no longer disabled due to significant medical improvement. (Tr. 281). The agency found Plaintiff had less than marked limitations acquiring and using information, noting Plaintiff's intelligence test results and the fact that Plaintiff was attending regular classes and had not repeated any grades. (Tr. 283). They also noted Plaintiff's significant improvement with speech, with 100 percent intelligibility in known-context conversation and 90 percent intelligibility in unknown-context conversation. (Tr. 283). The agency found Plaintiff had no limitations attending and completing tasks, and less than marked limitations interacting and relating with others. (Tr 283). They reiterated that while Plaintiff had some reported difficulties with peer relationships, there were no significant behavior problems or disciplinary actions at home or school. (Tr. 283). The agency further found Plaintiff had no

11

limitations moving and manipulating objects, caring for himself, or with his health and physical well-being. (Tr. 284). Because medical improvement had occurred – namely due to Plaintiff's significantly improved speech and language abilities and his ability to attend regular classes at school with no behavior problems – the agency found Plaintiff's disability had ceased. (Tr. 286).

On May 12, 2005, Plaintiff's speech-language pathologist stated Plaintiff had made progress in or attained all his goals and she planned to continue seeing him weekly to increase his language skills. (Tr. 429, 431). In June 2005, Plaintiff's school psychologist stated Plaintiff needed extended time to complete assignments, directions repeated when necessary, accommodations for testing, and shorter assignments. (Tr. 315). The psychologist also noted Plaintiff was unsuccessful at following directions, despite interventions, and she noted his continued low scores in listening and language skills standardized testing. (Tr. 314). Also in June 2005, Plaintiff presented to Dr. Adedipe complaining of difficulty breathing with exercise, and Dr. Adedipe noted possible asthma. (Tr. 289). Later in August, he noted an asthma exacerbation. (Tr. 291).

On August 23, 2005, Plaintiff's speech-language pathologist evaluated him and stated he had attained one of his goals and made progress in two others. (Tr. 329). She stated he demonstrated acquisition of skills to enhance communication and applied skills and knowledge outside the therapy setting. (Tr. 329). She planned to continue with weekly treatment to address Plaintiff's limitations in written and spoken language, which she stated limited his school success and communication with peers. (Tr. 335). When Dr. Adedipe saw Plaintiff on October 11, 2005, he noted Plaintiff's family and peer relationships were improved with therapy. (Tr. 294). He additionally noted Plaintiff's language, speech, reading, school performance, family, and peer relationships were within normal limits. (Tr. 294).

12

In December 2005, counseling notes identified Plaintiff's mental health symptoms as poor peer relations, excessive anxiety, and depressed mood. (Tr. 469). Interventions to address these issues included consulting with teachers, implementing strategies to improve school success, and teaching Plaintiff self-control strategies and positive cognitive messages to address his disruptive behaviors, depression, and anxiety. (Tr. 470). On February 20, 2006, Plaintiff was discharged from Beech Brook counseling. (Tr. 436, 439–40). The discharge summary noted both Plaintiff and his mother worked diligently to alleviate negative behaviors and improve age-appropriate behaviors, stating Plaintiff had achieved 90 percent of his goals. (Tr. 436). They encouraged Plaintiff's mother to seek further out-patient services if needed. (Tr. 436). His diagnoses at discharge were disruptive behaviors, overanxious disorder of childhood, dysthymic disorder, and psychosocial/environmental problems. (Tr. 436–37). The therapist assigned Plaintiff a GAF of 70. (Tr. 437).

In March 2006, speech-language pathologist Linda Lange noted Plaintiff's receptive and expressive language skills were moderately disordered for his age. (Tr. 339). Plaintiff's sentences sometimes contained multiple grammatical errors, but his sentences were complex and he could correct them with cues and reminders. (Tr. 339). She recommended continued weekly language therapy, and stated his prognosis was fair to good with continued intervention and home carry-over. (Tr. 339). At a meeting in April 2006, Plaintiff's teacher noted Plaintiff needed extended time to complete assignments and showed "some struggle in language arts". (Tr. 332). They planned to continue speech interventions. (Tr. 333).  Speech-language pathologist notes from June 7, 2006 indicate Plaintiff continued to address limitations in language skills. (Tr. 425).

Dr. Adedipe's treatment notes from June 13, 2006 indicate Plaintiff's mother wanted to get Plaintiff counseling because of his phobias, including phobias about eating. (Tr. 411). One of the

13

diagnostic impressions was "panic attack/phobia" and the notes list a psych referral. (Tr. 412). In a disability report dated August 1, 2006, Plaintiff's mother also reported Plaintiff's phobias, stating Plaintiff has difficulty learning, phobias, anxiety, and panic disorder. (Tr. 145). She also indicated Plaintiff does not understand things, estimated him to be at a first or second grade learning level, and stated he is "way behind children his own age" (Tr. 145), but she stated Plaintiff was not currently in special education classes or speech therapy. (Tr. 151). Plaintiff had a health checkup on October 5, 2006. (Tr. 381–82). The treatment notes indicate history of phobias of almost everything and state Plaintiff needs counseling. (Tr. 381). The notes also indicate, however, that Plaintiff's communication skills, self-help skills, social-emotional skills, and mental and cognitive skills all fell within normal limits. (Tr. 382). Dr. Adedipe reported Plaintiff had been in speech therapy for the past five years. (Tr. 382). Plaintiff's ultimate diagnoses were a history of phobias, behavior problems, and anger management issues, and mild, intermittent asthma. (Tr. 382). He was referred to Dr. Carson for psychological issues. (Tr. 382).

On October 19, 2006, Plaintiff's speech therapist noted Plaintiff consistently continued to make progress with following two-step directions and recalling facts from an orally presented story, but still had trouble with spelling irregular past-tense verbs. (Tr. 421). His speech skills appeared to be within normal limits, an he was progressing with following directions, but he was still moderately disordered with his language skills. (Tr. 421). Plaintiff was ultimately discharged from therapy on December 7, 2006 due to scheduling conflicts. (Tr. 421).

On January 8, 2007, psychologist Dr. Robert Carson noted Plaintiff's phobias – as reported by his mother – of wind, elevators, eating, and swallowing. (Tr. 358). He also noted Plaintiff was slow in class and fearful of almost everything. (Tr. 358). The doctor's interview with Plaintiff

14

revealed Plaintiff has normal likes and dislikes. (Tr. 358). Plaintiff likes sports, video games, and playing with his dog. (Tr. 358). Dr. Carson interpreted Plaintiff's statements to mean Plaintiff finds it difficult to let things go. (Tr. 358). Plaintiff was reticent, soft-spoken, and shy, with a flat affect and a difficult-to-discern mood. (Tr. 358). His thought stream bordered on paranoid and he was "certainly overanxious and fearful". (Tr. 358). Plaintiff displayed poor judgment and insight and his decision-making was "bound up by fear". (Tr. 359). Dr. Carson diagnosed Plaintiff with separation/attachment disorder, rule out avoidance disorder, rule out mental retardation and developmental disabilities. (Tr. 359). He also noted Plaintiff's poor school grades, and assigned a GAF of 68, indicating mild symptoms. (Tr. 359).

Plaintiff continued seeing Dr. Carson for therapy through June 2007. (Tr. 360–69). At these visits, he addressed fear issues (Tr. 360), anxiety and obsessive-compulsive symptoms (Tr. 360, 362, 366, 368–69), and interpersonal and anger-management problems (Tr. 362, 364, 366, 368). In February 2007, Dr. Carson noted obsessive-compulsive traits and generalized anxiety, rule out obsessive compulsive disorder (OCD). (Tr. 362). He also noted interpersonal difficulties and assigned a GAF of 70. (Tr. 362). Therapy at this session centered on teaching Plaintiff to refocus when he is in an obsessive mood. (Tr. 362). Plaintiff frequently reported difficulty getting along with his family at home, and sometimes presented as difficult-to-engage. (*See, e.g.,* Tr. 364, 366).

At a visit to Dr. Carson on April 23, 2007, Plaintiff reported difficulty getting along with family at home, and Plaintiff's mother reported Plaintiff exhibited selfish behavior because he did not like to share. (Tr. 366). Plaintiff's affect was flat and expressionless, and his mood appeared dysthymic, accompanied by withdrawn behavior and anger outbursts. (Tr. 366). He exhibited an obsessive thought process and self-doubting thought content, along with poor insight. (Tr. 366). Dr.

15

Carson again noted OCD traits, and generalized anxiety, rule out ADHD/inattentive disorder. (Tr. 366). He also noted Plaintiff's interpersonal problems and shy, withdrawn behavior. (Tr. 366). He assigned a GAF of 67, noting some difficulty in school, and reported Plaintiff would be transferred to child psychologist Dr. Reginald Blue. (Tr. 367). Plaintiff saw Dr. Carson one more time, and Plaintiff's mother reported things had calmed down, although she stated Plaintiff's attitude needed attention. (Tr. 368). Plaintiff asked about anger-management help, stating he had recently hit his cousin during an argument. (Tr. 368). Plaintiff reported he feels his anger controls him and he feels angry whenever he does not get his way. (Tr. 368). Dr. Carson noted OCD traits, generalized anxiety, rule out oppositional defiant disorder (ODD) and ADHD, inattentive disorder. (Tr. 369). He also indicated Plaintiff has a shy and introverted personality type and minor conduct problems. (Tr. 369). Plaintiff's GAF was 67. (Tr. 369).

Plaintiff began seeing Dr. Blue on July 5, 2007 and continued treating with him until at least October 30, 2008. (Tr. 370, 475–76). At the initial visit, Plaintiff reported anger issues, stating he becomes upset and talks back when he does not get his way. (Tr. 370). Plaintiff's mother also reported he is generally fearful, specifically mentioning a fear of eating and swallowing correctly. (Tr. 370). Plaintiff's mother stated she had recently assumed responsibility for her nieces and nephews, and Plaintiff reported some difficulties getting along with them. (Tr. 370). Dr. Blue's initial Mental Status Objective Summary stated Plaintiff was well-groomed, friendly, and cooperative, but withdrawn. (Tr. 483). He was alert and oriented to time, place, and person, and his affect was appropriate to the situation. (Tr. 483). Though Plaintiff's speech was soft, Dr. Blue did not indicate it was slurred, mumbled, or spoken with inappropriate inflection. (Tr. 483). Plaintiff's thought processes were logical and goal-directed, and his thought content was coherent. (Tr. 484).

16

He showed moderate awareness of his problems, and moderate willingness to take responsibility for his problems. (Tr. 484). Further, he showed moderate social and personal judgment. (Tr. 484).

Plaintiff's therapy with Dr. Blue largely focused on anger-management and his difficulties getting along with his family. (Tr. 370–71, 373–77, 475–77). Plaintiff generally appeared receptive to the concepts presented and verbally committed to make an effort to interact better with his family, acknowledging he should think before acting. (Tr. 371, 377). As reported by both Dr. Carson and Dr. Blue, many of Plaintiff's anger issues stemmed from frustrations over sharing with his younger family members. (Tr. 366, 368, 370). Plaintiff's mother clarified when Plaintiff wants his family's company, he seeks them out. (Tr. 371). When he tires of playing with them, or when they try to take things in his room to play with, he wants them to leave. (Tr. 371).

Plaintiff and his mother certainly consistently reported and discussed behavior problems with Dr. Blue; however, part way through treatment it became clear Plaintiff knew how he should behave to avoid friction with his family, but often chose to behave inappropriately regardless of the known consequences, for reasons he did not explain. (Tr. 373, 375, 476). In fact, at one point, Plaintiff mentioned he enjoyed messing with his mother. (Tr. 373). Plaintiff also reported some obsessive behavior, including one incident in which he refused to wear a pair of shoes he had worn when he stepped in dog feces, even after they had been thoroughly cleaned. (Tr. 477). Plaintiff noted some difficulty with school. At one point, he stated school was going "ok", but reported he had forgotten to turn in some homework assignments. (Tr. 371–72). Dr. Blue diagnosed Plaintiff with disruptive behavior disorder, not otherwise specified (DSM-IV 312.90) and repeated this diagnosis several times. (Tr. 371, 373, 375–77, 475–76).

Dr. Blue's records show Plaintiff made slow but steady progress, improving his family

17

interactions throughout treatment. In September 2007, Plaintiff stated things were going "ok" with his siblings and relatives. (Tr. 373). By May 2008, Plaintiff had improved somewhat in doing what his mother asked of him. (Tr. 375). Dr. Blue also noted improvement at Plaintiff's home in June 2008. (Tr. 375). In September 2008, when his mother expressed concern over Plaintiff's temper, Dr. Blue indicated most of the incidents discussed appeared to have been "anger w/cause" (Tr. 377). At that September visit, Plaintiff stated he was still working on maintaining positive relationships with his family. (Tr. 377). Later in September, his GAF was 80. (Tr. 379). Dr. Blue's two most recent records – both from October 2008 – indicate things had continued to progress with Plaintiff. (Tr. 476–77). His most recent GAF was 61, indicating mild symptoms. (Tr. 475).

In October 2008, Dr. Blue assessed Plaintiff's mental residual functional capacity (RFC). (Tr. 402–04). He stated Plaintiff does not receive any medications for his impairments. (Tr. 402). Dr. Blue stated Plaintiff has no problem acquiring and using information, no problem moving and manipulating objects, and no problem with his health and physical well-being. (Tr. 403–04). He stated Plaintiff has a slight problem interacting and relating to others, stating the problem needs to be addressed but is not debilitating. (Tr. 403). Dr. Blue reported Plaintiff has an obvious problem attending and completing tasks, but indicated he does not require additional assistance or structure to stay on task. (Tr. 403). Finally, Dr. Blue reported Plaintiff has an obvious problem caring for himself, stating Plaintiff has an anger control problem and some difficulty appropriately expressing his frustrations. (Tr. 404). Dr. Blue described Plaintiff as a very intelligent young man who exhibits some inappropriate behaviors when faced with daily frustrations, and has some follow-through issues and some issues interacting with others. (Tr. 404).

Also in October 2008, Plaintiff's school evaluated him. (*See* Tr. 383, 385). Intelligence

testing showed Plaintiff scored in the average range on verbal comprehension, perceptual reasoning, and processing speed. (Tr. 385). Though his working memory score fell in the low-average range, his full-scale IQ was 92, placing him in the average range compared to other children his age. (Tr. 385–86). While Plaintiff was able to answer questions involving social and practical situations within the average range, he demonstrated difficulty when asked to define general vocabulary words. (Tr. 386).He demonstrated relative strength in his ability to find similarities between words and concepts, but had great difficulty when asked to hold numbers and letters in his short term memory and manipulate them before repeating them. (Tr. 386). According to the school psychologist, this memory difficulty could affect his ability to sustain attention during class work. (Tr. 386).

Plaintiff scored in the low-average range on academic achievement testing. (Tr. 387). He scored in the borderline range on a reading comprehension achievement test. (Tr. 387–88). Although Plaintiff "made an effort to read quickly, he stumbled over words and repeated words." (Tr. 388). His general vocabulary appeared adequate, but he was unable to recognize some words and missed words due to reading quickly. (Tr. 388). There appeared to be a significant discrepancy between his average cognitive ability level and his ability to understand written words, which was well below grade and age-level expectations. (Tr. 389).  He had difficulty staying on task, formulating thoughts, and making comprehendible sentences. (Tr. 389). The school psychologist opined Plaintiff could benefit from learning skills to read for comprehension. (Tr. 388).

Plaintiff's teachers reported Plaintiff "relates appropriately to authority figures and usually interacts in an appropriate manner with his peers." (Tr. 390). Though one teacher reported reprimanding Plaintiff for behavior problems, he is generally well-behaved. (Tr. 390). In fact, Plaintiff's language arts teacher stated she "hardly ha[s] any trouble with [Plaintiff's] classroom

behavior." (Tr. 400). Plaintiff asks questions when he has difficulty, appears to listen actively, and appears to try his best in class. (Tr. 390). Though Plaintiff gives his best effort, he tires of academic tasks when required to sustain attention for an extended period of time. (Tr. 390). Plaintiff reported he stays up late and does not always eat breakfast, which could adversely affect his ability to concentrate. (Tr. 390). The school speech-language pathologist also evaluated Plaintiff. (Tr. 391). She stated Plaintiff had "shown steady progress in structured language arts activities, but continue[d] to need cues, verbal reminders, and structured resources to maintain his homework and class assignments." (Tr. 391). She reported Plaintiff showed increased interest in managing his work when seventh grade started, and routinely asked his teachers for assistance when he needed it. (Tr. 391).

Overall, the school report stated Plaintiff did not achieve adequately and was not making sufficient progress toward achieving adequately in the areas of written expression and reading comprehension. (Tr. 392). The evaluation ultimately found Plaintiff continued to qualify for special education speech-language services and noted Plaintiff could benefit from going to bed earlier on school nights. (Tr. 395).

On November 11, 2008, there was a school meeting to update Plaintiff's IEP. (Tr. 511). Plaintiff was described as very friendly and cooperative with peers and adults. (Tr. 511). The report further stated Plaintiff is very polite and courteous, does what is asked of him, does well following directions and completing assignments in a timely manner, asks questions in class, and actively listens to his teachers. (Tr. 511). The report noted Plaintiff will continue to receive speech-language therapy. (Tr. 512). Tests indicated Plaintiff falls in the low-average range in areas of reading and reading comprehension, and in the borderline range in written expression. (Tr. 512). His overall academic skill level is in the low-average range. (Tr. 512). On achievement testing, he fell in the

average range in every category except working memory, in which he fell in the low-average range. (Tr. 512). Other tests indicated he was performing at just over a fifth-grade level in reading, but this was based on his performance without accommodations. (Tr. 512).

According to the report, Plaintiff exhibits no social, emotional, or behavioral concerns. (Tr. 512). He has difficulties staying focused and tires of tasks that require extended periods of attention. (Tr. 512). For this reason, the report stated Plaintiff would benefit from having extended time to complete his work. (Tr. 512). To improve his basic reading and word identification, the IEP recommended allowing more time for assignments, repeated directions, an opportunity to redo assignments if Plaintiff did not understand the concepts, and testing accommodations including additional time for testing. (Tr. 514, 526–27). Plaintiff would receive special education instruction for speech and language outside his regular education classroom for less than 21 percent of the school day. (Tr. 515).

## ALJ Hearing

Plaintiff and his mother both testified at the ALJ hearing, which was held February 12, 2009. (Tr. 50). A medical expert (ME) was present, but did not testify. (Tr. 50, 67). At the time of the hearing, Plaintiff was in seventh grade. (Tr. 52). Plaintiff testified he attends "regular classes" for math, social studies, and language arts, but spends about an hour in special education classes per day four days per week and has a "special class" for reading. (Tr. 53, 57–58). Additionally, Plaintiff stated he has "[a] couple" friends at school and eats lunch with them, further stating he enjoys martial arts. (Tr. 55). He testified he has two sisters, with whom he gets along well. (Tr. 55). When questioned by his attorney, Plaintiff testified he feels comfortable interacting with other students at his school. (Tr. 55).

21

Plaintiff's mother also testified at the hearing. (Tr. 59). She testified she stays home to care for her four grandchildren and Plaintiff, explaining three of the children receive SSI and two of them are on welfare. (Tr. 59). Plaintiff's mother explained Plaintiff still panics frequently and has difficulty understanding things. (Tr. 59–60). When Plaintiff panics, she stated he experiences anger, frustration, and fear, and panicked even coming into the building for the hearing because he fears elevators. (Tr. 60). During conversation, Plaintiff's mother testified Plaintiff becomes angry and hyper if he does not understand or thinks something "should be another way". (Tr. 60). She further testified Plaintiff "goes off" into a panic if his nieces and nephews ask him for something, move his things, or bump into him. (Tr. 61).

Plaintiff's mother testified at one point Plaintiff had wanted to quit school due to frustration, and "started trying to stay up all night to do his work" until the school accommodated him. (Tr. 61, 66). According to Plaintiff's mother, he has never taken any medications. (Tr. 61). She testified about Plaintiff's visits to psychiatrist Dr. Blue (Tr. 61–62) and described Plaintiff's eating problems, stating he does not always realize when he is full, and claims his stomach hurts when he is full. (Tr. 62). She explained he ate nothing but milk for his first five years of life because anything else made him vomit. (Tr. 62). She also testified her son is forgetful due to memory difficulties. (Tr. 62).

When questioned by Plaintiff's attorney, Plaintiff's mother described Plaintiff's issues with body image, stating he constantly worries about his appearance. (Tr. 62–63). She also said on one occasion after stepping in dog feces, Plaintiff refused to wear the shoe for two to three months – even after washing it – because he said it stank. (Tr. 63). She explained Plaintiff once had a friend who lived across the street and looked out for Plaintiff, but this friend had moved. (Tr. 64). Plaintiff's mother does not allow him to have other friends because she says the other children take

22

advantage of him. (Tr. 64). She recounted one story of another boy taking Plaintiff's things and Plaintiff failing to realize the other boy was not his friend. (Tr. 64). At home, Plaintiff's mother said she has to watch Plaintiff closely with the other children because he stays angry with them over minor annoyances. (Tr. 65).

The ALJ did not see any conflicts in the evidence or other matters he did not understand requiring testimony from the ME, and Plaintiff's attorney did not ask any further questions of anyone. (Tr. 67).

ALJ Decision

On March 4, 2009, the ALJ issued an opinion holding Plaintiff's disability ended May 1, 2005 and he had not been disabled again since that date. (Tr. 18, 33). He found Plaintiff's comparison-point date was January 14, 2002. (Tr. 21). At that time, Plaintiff had the following medically determinable impairments: "developmental (borderline intellectual functioning) and speech and language delays." (Tr. 21). According to the ALJ, in combination these impairments were found to functionally equal listings 112.05D and/or 2.09. (Tr. 21). The ALJ found medical improvement occurred as of May 1, 2005. (Tr. 21). He cited the evidence that by February 2005, Plaintiff's speech intelligibility had increased to 100 percent in known contexts and 90 percent in unknown contexts, and stated there was no evidence of mental retardation. (Tr. 21). The ALJ further found Plaintiff's comparison-point date impairments had not met, medically equaled, or functionally equaled one of the comparison-point date listings since May 1, 2005, stating Plaintiff has no abnormalities in perception, cognition, affect, or behavior associated with organic dysfunction of the brain. (Tr. 22). The ALJ also found Plaintiff has average intelligence, and does not have medically diagnosed borderline intellectual functioning. (Tr. 22).

To support his determination, the ALJ cited evidence showing Plaintiff's speech intelligibility had increased to 90 percent in the unknown context and psychological treatment notes indicating Plaintiff achieved 90 percent of his expected goals. (Tr. 23). The ALJ also cited treatment notes indicating Plaintiff was diagnosed with separation/adjustment disorder "and rule out avoidance personality disorder, and an obsessive-compulsive disorder", but was assigned a GAF of 70, which does not indicate marked and severe functional limitations. (Tr. 23). Further, the ALJ noted the fact that Plaintiff's asthma was only mild and intermittent. (Tr. 23). The ALJ also noted Dr. Blue's diagnosis of disruptive behavior disorder and stated Dr. Blue had assigned Plaintiff GAF levels between 61 and 80. (Tr. 24). The ALJ gave greater weight to the school district's determination that Plaintiff has average intelligence than to Dr. Konieczny's assessment that Plaintiff has borderline intellectual functioning because Dr. Konieczny saw Plaintiff on only one occasion – in March 2005, when the Commissioner agrees Plaintiff remained disabled – and because Plaintiff was fatigued during Dr. Konieczny's testing. (Tr. 24). To further support his decision, the ALJ noted Plaintiff's medical evidence since 2002 has shown good progress in speech-language therapy. (Tr. 24).

Since May 1, 2005, the ALJ found Plaintiff's comparison-point date impairments resulted in less than marked  limitation in acquiring and using information, and attending and completing tasks. (Tr. 25–26). He also found Plaintiff's comparison-point date impairments had caused no limitations in several areas: (1) Plaintiff's ability to interact and relate with others; (2) Plaintiff's ability to move and manipulate objects; (3) Plaintiff's ability to care for himself; and (4) Plaintiff's health and physical well-being. (Tr. 27–29). Thus, his comparison-point date impairments did not meet or equal a listing. (Tr. 22).

The ALJ also determined since May 1, 2005, Plaintiff has not had an impairment or

24

combination of impairments that meets, medically equals, or functionally equals a listing. (Tr. 30). The ALJ found Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms not credible for the period since May 1, 2005. (Tr. 31). Specifically, he noted the evidence does not support an indication that Plaintiff's psychological issues rise to the level of marked or severe. (Tr. 31). Additionally, the ALJ noted Plaintiff is in regular classes in seventh grade and attends special education classes less than 21 percent of the school day. (Tr. 31). Ultimately, the ALJ determined Plaintiff "generally has not received the type of medical treatment or specialized education one would expect for a disabled child with marked and severe functional limitations." (Tr. 32). Since May 1, 2005, he found Plaintiff has less than marked limitations in acquiring and using information, and in attending and completed tasks; he further found Plaintiff has no limitation in moving and manipulating objects, caring for himself, or his physical health and well-being. (Tr. 32). Thus, the ALJ determined Plaintiff had not had an impairment or combination of impairments that met or equaled a listing since May 1, 2005. (Tr. 30).

The ALJ determined Plaintiff's disability ended May 1, 2005, and found he had not become disabled again since that date. (Tr. 33). The Appeals Council denied review (Tr. 8), making the ALJ's decision the final decision of the Commissioner. *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993). Plaintiff challenges the ALJ's decision, alleging substantial evidence does not support it. (Doc. 28, at 1).

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the

record."*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for SSI is predicated on the existence of a disability. 42 U.S.C. § 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). In the case of a claimant under the age of 18, the Commissioner follows a three-step evaluation process – found at 20 C.F.R. § 416.924(a) – to determine if a claimant is disabled:

1. Is claimant engaged in a substantial gainful activity? If so, the claimant is not disabled regardless of their medical condition. If not, the analysis proceeds.

2. Does claimant have a medically determinable, severe impairment, or a combination of impairments that is severe? For an individual under the age of 18, an impairment is not severe if it is a slight abnormality or a combination of slight abnormalities which causes no more than minimal functional limitations. If there is no such impairment, the claimant is not disabled. If there is, the analysis proceeds.

3.     Does the severe impairment meet, medically equal, or functionally equal the criteria of one of the listed impairments? If so, the claimant is disabled. If not, the claimant is not disabled.

To determine, under step three of the analysis, whether an impairment or combination of impairments functionally equals a listed impairment, the minor claimant's functioning is assessed in six different functional domains. 20 C.F.R. § 416.926a(b)(1). This approach, called the "whole child" approach, accounts for all the effects of a child's impairments singly and in combination. SSR 09-1P, 2009 WL 396031, at *2. If the impairment results in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain of functioning, then the impairment is of listing-level severity and therefore functionally equal to the listings. 20 C.F.R. § 416.926a(a). A "marked" limitation is one that is more than moderate but less than extreme, and interferes "seriously" with the ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2)(I). An "extreme" limitation is one that interferes "very seriously" with the ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(3)(I). The six functionality domains to be assessed are: (I) acquiring and using information, (ii) attending and completing tasks, (iii) interacting and relating with others, (iv) moving about and manipulating objects, (v) caring for yourself, and (vi) health and physical well-being. 20 C.F.R. § 416.926a(b)(1).

### DISCUSSION

Plaintiff alleges substantial evidence does not support the ALJ's conclusion that Plaintiff's disability ceased as of May 1, 2005. Specifically, Plaintiff contends the ALJ failed to properly assess evidence of all Plaintiff's medically determinable impairments. (Doc. 28, at 7). He also argues the ALJ erred by failing to obtain ME testimony at the hearing. (Doc. 28, at 11).

<u>Substantial Evidence Supports the ALJ's Conclusions</u>

27

When conducting a continuing disability review, courts use a three-step sequential evaluation process:

1. Has there been medical improvement in the impairments the plaintiff had at the time of the agency's most recent favorable decision?

2. If there has been medical improvement, do the impairments the plaintiff had at the most recent favorable decision still meet or equal the severity of the listed impairment they previously met or equaled?

3. Is the plaintiff currently disabled? That is, do all the impairments the plaintiff currently has – including those he did not have at the time of the most recent favorable decision – qualify the person as disabled? Under this third step of the evaluation, courts first ask whether the plaintiff has a severe impairment or combination of impairments. If he does, the court asks whether the current impairments meet, medically equal, or functionally equal a listed impairment. If they do not, disability has ceased.

*See* 20 C.F.R. § 416.994a(b).

To determine whether medical improvement has occurred, the plaintiff's current condition is compared to the severity of his condition "at the time of the most recent medical decision that [he was] disabled." 20 C.F.R. § 416.994(b)(1)(I). The time of the most recent favorable medical decision is known as the "point of comparison", or the "comparison-point date." 20 C.F.R. § 416.994(b)(1)(vii). In Plaintiff's case, the ALJ determined the comparison-point date to be January 14, 2002, the date of the most recent decision finding Plaintiff disabled. (Tr. 21, 199, 204). At that time, Plaintiff's speech disorder functionally equaled listing 2.09. (Tr. 199). His intelligibility in known-context conversation was 66 percent, and in unknown-context conversation his intelligibility was only 50 percent, even with request for clarification. (Tr. 199). To determine whether medical improvement has occurred, the severity of Plaintiff's condition on January 14, 2002 is compared to its severity on May 1, 2005, the date the ALJ determined Plaintiff's disability had ceased. (Tr. 33).

After 2002, Plaintiff's records indicate his condition improved. In July 2003, and again in

28

May 2004, Dr. Adedipe's treatment records indicate Plaintiff's language, speech, reading, school performance, family, and peer relationships were all within normal limits. (Tr. 266, 271). By September 2004, Plaintiff's speech-language pathologist noted Plaintiff had attained one of his therapy goals and made progress in all but one of his goals. (Tr. 214). Though Plaintiff did begin seeing LSW Merriman for psychological counseling in October 2004, by January 2005 she reported his behavior at home had improved, he felt much happier and had several friends, he never exhibited disruptive behaviors, and his depression had "definitely decreased." (Tr. 220, 251). Plaintiff's mother and sister reported difficulty understanding Plaintiff's speech in early 2005 (Tr. 119, 207), but his speech therapist stated Plaintiff's intelligibility had increased to 100 percent in known-context conversation and 90 percent in unknown-context conversation. (Tr. 210). Though Dr. Konieczny reported Plaintiff had an IQ of 77 and suffered from borderline intellectual functioning, he also reported Plaintiff was performing adequately in his regular classes, with no disciplinary difficulties, showed no indications of mood swings or mood disturbance, and did not display speech or articulation difficulties. (Tr. 276–78). This information shows a "decrease in the medical severity of [Plaintiff's] impairment[s]" and thus shows medical improvement between the comparison-point date and the date the ALJ determined disability ceased. *See* 20 C.F.R. § 416.994a(c).

The ALJ concluded that as of May 1, 2005, Plaintiff no longer met, medically equaled, or functionally equaled listing 112.05D or 2.09. (Tr. 22–23). The ALJ found that since May 1, 2005, Plaintiff's comparison-point date impairments resulted in the following functional limitations: less than marked limitation in acquiring and using information; less than marked limitation in attending and completing tasks; no limitation in interacting and relating with others; no limitation in moving or manipulating objects; no limitation in his ability to care for himself; and no limitation in his

health and physical well-being. (Tr. 25–29). To functionally equal a listing, a plaintiff must have marked limitations in two domains of functioning. 20 C.F.R. § 416.926a(d). Thus, the ALJ found Plaintiff's impairments did not functionally equal a listing. (Tr. 22). Listing 112.05(D) covers metal retardation, characterized by significantly subaverage general intellectual functioning – specifically, a verbal, performance, or full-scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant limitation of function". 20 C.F.R. Pt. 4, Subpt. P, App. 1, Listing 112.05D. Listing 2.09 covers loss of speech due to any cause, with inability to produce by any means speech that can be heard, understood, or sustained. 20 C.F.R. Pt. 4, Subpt. P, App. 1, Listing 2.09.

Plaintiff alleges his speech delays and borderline intelligence persist. (Doc. 28, at 9). In March 2005, Plaintiff had a full-scale IQ of 77 (Tr. 277), which does fall in the borderline range but falls outside of listing 2.09. His sub-test scores were as follows: 79 on verbal comprehension; 82 on perceptual reasoning; 71 on working memory; and 97 on processing speed. (Tr. 277). Plaintiff's speech had improved to 90 percent intelligibility in even unknown-context conversation (Tr. 210),Plaintiff's psychological status had improved in 2005 (Tr. 251), and Plaintiff was performing adequately in his regular-education classes (Tr. 276). This evidence supports the ALJ's conclusion Plaintiff no longer met, medically equaled, or functionally equaled a listing as of May 1, 2005. Moreover, these conditions have continued to improve: In February 2006, Plaintiff was discharged from counseling having achieved 90 percent of his goals (Tr. 436); in October 2006, Plaintiff's speech therapist noted Plaintiff consistently continued to make progress, his speech skills appeared to be within normal limits, and he was progressing with following directions (Tr. 421); and in October 2008, Plaintiff's full-scale IQ was 92, placing him in the average range (Tr. 385–86).

The ALJ found Plaintiff had two severe impairments since May 1, 2005: learning disorder and disruptive behavior disorder, not otherwise specified. (Tr. 29). Plaintiff contends the ALJ did not appropriately analyze the additional impairments Plaintiff suffered at the time of the hearing, or those that were diagnosed after the comparison-point date. (Doc. 28, at 8–9). Specifically, Plaintiff claims the ALJ erred by failing to address the existence and severity of ADHD, anxiety disorder, depression, and OCD. (Doc. 28, at 9). According to Plaintiff, "nowhere in his decision does the ALJ acknowledge the diagnoses of anxiety, depression, ADHD[,] or obsessive compulsive disorder." (Doc. 28, at 9). But the ALJ did consider these alleged impairments, their severity, and their effect on Plaintiff's functioning.

The ALJ acknowledged Plaintiff's alleged ADHD (Tr. 29), but the evidence does not show Plaintiff has ever actually been diagnosed with the disorder. In March 2005, Dr. Konieczny's psychological evaluation indicated that, in fact, Plaintiff had never been diagnosed with ADHD and was not taking any prescribed medications. (Tr. 276). Moreover, in March and April 2007, psychologist Dr. Carson listed Plaintiff's diagnoses as OCD traits, generalized anxiety, rule out ADHD. (Tr. 365–66). In June 2007, Dr. Carson listed Plaintiff's diagnoses as OCD traits, generalized anxiety, rule out ODD, ADHD, and Inattentive. (Tr. 369). Plaintiff has been in regular education classes since kindergarten. (Tr. 276). Plaintiff's teachers report he relates appropriately to authority figures and usually interacts appropriately with his peers. (Tr. 390). They say he is well-behaved, appears to listen actively, appears to try his best in class, and asks questions when he has difficulty. (Tr. 390). Though they do say he tires of academic tasks when required to sustain attention for an extended period, they note Plaintiff's reports he stays up late and does not always eat breakfast, indicating this could adversely affect his concentration. (Tr. 390). When Dr. Blue

31

assessed Plaintiff's mental RFC, he stated Plaintiff has a problem attending and completing tasks, but also stated he did not require additional assistance or structure to stay on task. (Tr. 403). Further, the school has accommodated Plaintiff's concentration difficulties by allowing him extended time to complete his work. (Tr. 512).

The ALJ also addressed Plaintiff's anxiety and depression issues. Specifically, he referred to Plaintiff's counseling with Merriman to treat anxiety and depression, noting Plaintiff achieved 90 percent of his therapy goals. (Tr. 23). When Merriman stopped seeing Plaintiff, his depression had decreased, though he still experienced some anxiety issues. (Tr. 251, 436). Dr. Carson did diagnose Plaintiff with generalized anxiety (Tr. 360, 362, 365–66, 369), but he consistently assigned Plaintiff a GAF of between 67 and 70, indicating mild symptoms. (Tr. 359, 361–62, 365, 367, 369). Child-psychologist Dr. Blue's treatment notes indicate Plaintiff made steady progress, and Dr. Blue's diagnoses never mentioned anxiety disorders or OCD. (*See* Tr. 370–71, 373–77, 475–77). Plaintiff never discussed depression with Dr. Carson or Dr. Blue, and he took no medications for anxiety or depression. (*See* Tr. 355–79, 402, 475–80). Dr. Carson and Dr. Blue both consistently assigned Plaintiff GAF levels between 61 and 80 – indicating only mild symptoms affecting his functioning. (Tr. 359, 361–62, 365, 367, 369, 379, 475). Thus, the ALJ properly found anxiety and depression were not severe impairments, as they did not significantly impact his ability to carry out daily activities.

Dr. Carson did diagnose Plaintiff with OCD *traits* and discussed ways to reduce his obsessive thoughts (Tr. 362, 365–66, 368–69), but he never officially diagnosed Plaintiff with OCD. Further, as mentioned above, he always assessed Plaintiff a GAF reflecting symptoms imposing only mild limitations. Plaintiff did discuss some obsessive behavior with Dr. Blue (Tr. 477), but Dr.

Blue's only diagnosis was disruptive behavior disorder. (Tr. 371, 373, 375–77, 475–76). Once again, Dr. Blue always assigned Plaintiff a GAF between 61 and 80, indicating only mild limitations. Further, Dr. Blue's notes indicate consistent improvement in Plaintiff's mental condition. (Tr. 373, 375, 377, 476–77).

The ALJ did find Plaintiff's disruptive behavior disorder to be severe, but he did not find it disabling. (Tr. 29–33). Substantial evidence supports this conclusion. Plaintiff alleges he has "increasingly significant difficulties interacting with schoolmates, peers[,] and family members" (Doc. 28, at 10), but the evidence shows the opposite is actually true. Dr. Blue's treatment notes document more than a year of Plaintiff's treatment for his behavior disorder. (Tr. 370–79, 475–78). Throughout that time, Plaintiff consistently progressed, improving his relationships with family. (Tr. 373, 375, 377, 476–77). Plaintiff's mother expressed concern over Plaintiff's temper, but Dr. Blue noted on one occasion that the incidents actually appeared to have been anger with cause. (Tr. 377).

When he assessed Plaintiff's mental RFC, Dr. Blue reported Plaintiff needs to address a slight problem interacting with and relating to others, but he stated this problem is not debilitating. (Tr. 403). Further bolstering the notion that Plaintiff's disruptive behavior is not disabling, Plaintiff's school reported he relates appropriately to authority figures and peers, is generally well-behaved, listens actively, tries his best in class, and asks questions when he has difficulty. (Tr. 390). Additionally, Plaintiff's most recent IEP states Plaintiff exhibits no social, emotional, or behavior concerns, describing Plaintiff as very friendly and cooperative, someone who is polite and courteous, does what is asked of him, does well following directions and completing assignments in a timely manner, asks questions in class, and actively listens to his teachers. (Tr. 511–12). When questioned by his attorney, Plaintiff even testified he feels comfortable interacting with other students at his

school. (Tr. 55).

The ALJ also found Plaintiff's learning disorder is a severe impairment (Tr. 29), but substantial evidence supports his conclusion it is not a disabling impairment. Plaintiff's full-scale IQ has increased over time: at the comparison-point date, his most recent IQ was 74 – placing him in the borderline range – and his speech was intelligible only 50 percent of the time in the unknown context (Tr. 84, 194); in 2005, Plaintiff's full-scale IQ was 77 and his intelligibility in the unknown context had improved to 90 percent (Tr. 210, 277); and by October 2008, his full-scale IQ was 92, placing him in the average range (Tr. 385–86). Plaintiff's school recognized his continued difficulties with concentration and language-arts, and his IEP accommodated these difficulties by allowing him extended time to complete his work and providing testing accommodations. (Tr. 514, 526–27). Plaintiff spends less than 21 percent of his time in special education classes, where he continues to receive speech therapy. (Tr. 515). Plaintiff's IQ consistently increased and most recently fell in the average range; his speech is now almost entirely intelligible; and he spends around 80 percent of his time at school in regular education classes, where he is generally well-behaved, tries his best, actively listens, and asks questions when he has difficulty.

Combined with the rest of the evidence regarding the effects of Plaintiff's disruptive behavior disorder and other psychological issues, this evidence provides substantial evidence supporting the ALJ's conclusion that the impairments Plaintiff developed between the comparison-point date and the hearing date are not disabling.[1] The Court affirms the ALJ's conclusions that Plaintiff's disability ceased on May 1, 2005 and he has not become disabled again since that date.

---

1. While recounting his medical history in his Brief, Plaintiff notes asthma-related issues. (Doc. 28, at 5), but he does not appear to argue these were disabling. Moreover, Dr. Adedipe described Plaintiff's asthma as only mild and intermittent. (Tr. 382).

ME Testimony Was Not Required

Plaintiff also alleges the ALJ erred by failing to call upon the ME who was present during the hearing. (Doc. 28, at 11). "Specifically, Plaintiff argues that the ALJ based his decision on knowledge and expertise with which he is not equipped." (Doc. 28, at 11).

"An ALJ has discretion to determine whether further evidence, such as additional testing or expert testimony, is necessary." *Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001) (citing 20 C.F.R. §§ 404.1517, 416.917). The regulations give the ALJ the discretion to determine whether to consult a ME, whose primary function is to explain medical terms and the findings in medical reports in more complex cases in terms the ALJ – who is not a ME – may understand. *Hufstetler v. Comm'r of Soc. Sec.*, 2011 WL 2461339, *11 (N.D. Ohio 2011) (quoting 20 C.F.R. §§ 20 C.F.R. 416.927(f)(2)(iii); *and Fullen v. Comm'r of Soc. Sec.*, 2010 WL 2789581, *12 (S.D. Ohio 2010)). Further, failure to order additional testing or expert testimony is examined under an abuse of discretion standard. *Foster*, 279 F.3d at 355–56; *see also Hawkinberry v. Comm'r of Soc. Sec.*, 2011 WL 2555272, *7 n.3, *adopted by* 2010 WL 2554243 (N.D. Ohio 2011). The Northern District of Ohio has stated "[c]learly, the ALJ has discretion to consult an ME, but is *not* required to do so." *Boutros v. Astrue*, 2010 WL 3420296, *3, *adopted by* 2010 WL 3420288 (emphasis in original).

Generally, an ALJ has not abused his discretion by failing to obtain ME testimony where there is already sufficient evidence in the record for the ALJ to evaluate the plaintiff's conditions. *Foster*, 279 F.3d at 356; *Williams v. Callahan*, 1998 WL 344073, *4 n.3 (6th Cir. 1998); *Davis v. Chater*, 1996 WL 732298, *2 (6th Cir. 1996); *Boutros*, 2010 WL 3420296 at *3. Remand is appropriate in several instances; for example where: (1) the ALJ seems to have failed to review particular medical findings that bear directly on whether a plaintiff is disabled, *Garcia v. Astrue*,

35

2011 WL 899652, *14 (N.D. Ohio 2011); (2) the ALJ interpreted raw medical data on his own, rather than accepting medical opinions of record or consulting a ME, *Roso v. Comm'r of Soc. Sec.*, 2010 WL 1254831, *13, *adopted by* 2010 WL 1254833 (N.D. Ohio 2010); (3) where the ALJ noted clinical findings meeting a listing were present, but not consistently present, *St. Clair v. Astrue*, 2010 WL 3370568, *8 (N.D. Ohio 2010); or (3) the ALJ made an RFC determination in the absence of any medical opinion as to RFC, and without reviewing a substantial amount of the plaintiff's medical records, *Deskin v. Comm'r of Soc. Sec.*, 605 F. Supp. 2d 908, 911 (N.D. Ohio 2008).

Here, sufficient evidence exists in Plaintiff's records for the ALJ to evaluate Plaintiff's conditions. The ALJ conducted a lengthy review of Plaintiff's medical records, reviewing his school records, speech therapy records, and psychological treatment notes, among other things. (Tr. 23–32). There is no indication he interpreted raw medical data on his own. Further, the RFC assessment completed by Plaintiff's treating psychiatrist Dr. Blue supports the ALJ's conclusion. Dr. Blue stated Plaintiff has no problem acquiring and using information, no problem moving and manipulating objects, and no problem with his health and physical well-being. (Tr. 403–04). Regarding Plaintiff's difficulties interacting with and relating to others, he stated this was a slight problem, which needed to be addressed but was not debilitating. (Tr. 403).

Moreover, substantial evidence in Plaintiff's record indicates he has consistently improved. He has achieved 90 percent intelligibility in even unknown-context conversation (Tr. 210); he attends regular education classes for the vast majority of his school days, teachers report few behavioral problems, and he interacts appropriately with adults and peers (Tr. 390, 511, 515); his full-scale IQ has reached the average range (Tr. 385–86); and Dr. Blue's notes indicate he has made consistent progress toward his goals of managing his anger to improve his family relationships (Tr.

373, 375, 377, 476–77). Thus, the ALJ did not abuse his discretion in failing to obtain ME testimony.

CONCLUSION

Following review of the arguments presented, the record, and applicable law, the Court finds the ALJ's decision supported by substantial evidence. Therefore, the Court affirms the Commissioner's decision finding Plaintiff's disability ceased May 1, 2005 and finding he has not become disabled again since that date.

IT IS SO ORDERED.

    s/James R. Knepp, II    
United States Magistrate Judge

37